## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| **DANIEL BORDER,** *et al.***,** | ) | **CASE NO.  4:08CV3032** |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **JUDGE PETER C. ECONOMUS** |
| | ) | |
| **TRUMBULL COUNTY BOARD** | ) | **MEMORANDUM OPINION** |
| **OF COMMISSIONERS,** *et al.***,** | ) | **AND ORDER** |
| | ) | |
| **Defendants.** | ) | |

This matter is before this Court upon three separate Motions for Summary Judgment.  (Dkt. # 55, 59, 76).  The motions each seek summary judgment on the issue of qualified immunity.

## I. PROCEDURAL BACKGROUND

On July 16, 2009, Defendant Shawn Rentz filed his Motion for Summary Judgment.  (Dkt. # 41).  On July 17, 2009, Defendants Thomas L. Altiere, John and Jane Doe, "Deputy Sabulsky," "Assistant Warden Shay," "Assistant Warden Buch," John Naples, Robert D. Eckenrod, William Meeker, Todd Harvey, Mike Geer, Mike Palumbo, William Showers, Nick Achladis, "Corrections Officer Gardi," "Corrections Officer Dykes," and "John and Jane Doe Corrections Officers" filed their Motion for Summary Judgment.  (Dkt. # 55).  On July 22, 2009, Defendants the City of Cortland, John Weston, and Steve Orslene filed their Motion for Summary Judgment.  (Dkt. # 59).  On October 19, 2009, Plaintiffs Daniel B. Border, Daniel B. Border, and Diane Border ("Plaintiffs") filed an Opposition to all Motions for Summary Judgment.  (Dkt. # 76).

1

On October 19, 2009, Plaintiffs dismissed Defendants Thomas L. Altiere, Eric Shay, John T. Buch, Robert D. Eckenrod, Virginia Gardi, Randy A. Dykes, Jr., and Stephen S. Sabulsky in their individual and official capacities, without prejudice, pursuant to Fed. Rule Civ. P. 41(a)(1)(A), and with the consent of those defendants. (Dkt. # 79).

On October 29, 2009, Shawn Rentz filed a Reply to Plaintiffs' Opposition to all Motions for Summary Judgment. (Dkt. # 81). On October 29, 2009, Trumbull County Defendants, Nick Achladis, John and Jane Doe, Mike Geer, Todd Harvey, William Meeker, John Naples, William Showers, and the Trumbull County Board of Commissioners ("County Defendants") filed a Reply to Plaintiffs' Opposition to all Motions for Summary Judgment. (Dkt. # 84). On October 31, 2009, City of Cortland, John Weston, and Steve Orslene filed their Reply. (Dkt. # 85).

In addition, on October 29, 2009, the County Defendants filed a Motion to Strike the Affidavits of Gary Smith, Lewis Moler, Robert Key, and Ted Murray. (Dkt. # 83). On November 13, 2009, Plaintiffs filed an Opposition to the Motion to Strike (Dkt. # 88), and on November 20, 2009, the County Defendants filed a Reply (Dkt. # 89). On November 13, 2009, Plaintiffs filed a Motion for Leave to File Clarifying Affidavits of Gary Smith, Lewis Moler, and Robert Key. (Dkt. # 87). The County Defendants have not opposed Plaintiffs' Motion to Clarify.

## II. FACTUAL BACKGROUND

This action arises out of Adam Border's ("Border") arrest, subsequent transportation, and detention at the Trumbull County Jail. On January 12, 2008, Officer

Shawn Rentz of the Bazetta Township Police Department, Officers Steve Orslene and John Weston of the City of Courtland Police Department, and Deputy Sheriff Stephen Sabulsky of the Trumbull County Sheriff's Department ("Arresting Officers") responded to a BP gas station in Cortland, Ohio after receiving reports of a physical altercation involving Border and his ex-wife, Lacina Smith.  (Dkt. # 1 at ¶ 12; Dkt. #43 at ¶ 6).

### A. Arrest and Transportation

At the scene, witnesses observed that Border showed obvious signs of intoxication.  In her affidavit, Lacina Smith states that Border was visibly intoxicated, his face was pale, his eyes were glazed, his was speech slurred, he had difficulty maintaining balance, and he had poor coordination.  (Dkt. # 76-1 ¶ 7-8).  Smith recalls that another witness, Michael Overton, told officers that Border was under the influence.  (Dkt. # 76-1 ¶ 19).

Lacina Smith also recalls that she witnessed Adam exit a vehicle with a pill bottle in his hand.  (Dkt. # 76-1 at ¶ 5).  Smith states that she advised Officer Rentz and another officer from the Cortland Police Department that Border was "messed up" and "had a pill bottle on him that was full pills (sic)."  (Dkt. # 76-1 at ¶ 18)

Justin Schubert, a friend of Border, was also present at the scene and recalls that Border appeared intoxicated, had difficulty maintaining eye contact, had difficulty keeping his head up, and had difficulty maintaining consciousness.  (Dkt. # 76-2 at ¶¶ 14-15).  In his affidavit, Schubert states that he asked officers to "look after" Border.  (Dkt. # 76- 2 at ¶ 15).  Schubert recalls telling the officers at the time that Border "isn't acting like himself right now."  (Dkt. # 76-2 ¶ 15).  Both Lacina Smith and Justin Schubert state

that Border went behind the BP building before the police arrived.  (Dkt. #76-at ¶ 11; Dkt. # 76-2 at ¶ 9).  According to Schubert, Border was behind the building for approximately 1-2 minutes.  (Dkt. # 76-2 at ¶ 9).  A prescription drug bottle was later found at the scene, but not until a full 24 hours after Border's arrest, and after Border's death.  (Dkt. # 41-1 at ¶ 16).

Border was arrested and transported to the Trumbull County Jail by City of Cortland Police Officer John Weston.  (Dkt. # 59-2 at ¶ 7).  In their briefs, multiple parties refer to a video recording, submitted by the City of Cortland, John Weston, and Steve Orslene,  showing a portion of Border's transportation to the Trumbull County Jail. (Dkt. # 60).  In the video, Border appears either intoxicated or very tired.  While Border appears to nearly nod off multiple times, he is able to hold an intelligible conversation with Officer Weston throughout the video.  At no point in the video does the subject of medications come up during the conversation between Border and Officer Weston.

### B. Detention

At the Trumbull County Jail, Border was booked by Officer Michael Palumbo. (Dkt. # 49 at ¶ 8).  Sometime shortly after he was booked, Border was treated by Noreen Whitlock for a gash on his forehead.  (Dkt. # 77-1 at 28-29, 36).  Whitlock is an unlicensed medical assistant who, on the night of Border's death, was assigned general nursing duties and to distribute medications to inmates.    (Dkt. # 77-1 at 17-18).  While treating Border's forehead, Whitlock states that she asked Border if he "drank anything or ingested anything."  (Dkt. # 77-1 at 37).  According to Whitlock, Border responded by telling her "no" several times.  (Dkt. # 77-1 at 37).

4

Officer Todd Harvey observed Border when he was brought to the second floor of the jail, which is where inmates are placed who are not deemed by a booking officer to be a suicide risk or otherwise require special monitoring.  (Dkt. # 49 at ¶ 9).  Officer Harvey observed that Border was steady on his feet, did not have difficulty walking, and was able to make his own bed.  (Dkt. # 49 at ¶¶ 6, 10-11).  Thirty minutes later, Border requested an unoccupied cell.  (Dkt. # 49 at ¶¶ 12-13).  Officer Harvey denied the request, and recalls that during his conversation with Border, Border did not appear to complain of a medical problem, nor did he have trouble breathing or speaking.  (Dkt. # 49 at ¶ 14).

Throughout the evening of Border's death, various corrections officers conducted hourly "watch tours."  The purpose of these watch tours was to ensure that inmates were safe, to provide medical treatment to inmates if necessary, to respond to inmate concerns, and to ensure that all inmates were counted and present.  (Dkt. # 51 at ¶ 10).  Officers William Showers, Todd Harvey, William Mekker, and John Naples checked on Border at least every hour.  (Dkt. # 46 at ¶¶ 12, 17; Dkt. # 48 at ¶ 8; Dkt. # 49 at ¶¶ 19-20; Dkt. # 50 at ¶ 10; Dkt. # 51 at ¶¶ 9, 11).  The corrections officers state in their affidavits that they observed Border sleeping, but breathing, on his bunk at approximately 12:05 a.m., 3:00 a.m., 3:18, a.m., 4:10 a.m., and 4:50 a.m.  (Dkt. # 46 at ¶ 13; Dkt. # 48 at ¶ 13; Dkt. # 49 at ¶ 24; Dkt. # 50 at ¶ 16).  None of these officers reported any evidence or personal awareness that Border was experiencing any medical condition other than appearing intoxicated.

Officer Nicholas Achladis accompanied Nurse Whitlock as she distributed medications to inmates on the second floor around 8:50 p.m.  (Dkt. # 52 at ¶ 10).  Officer

Achladis recalls that during this "med pass" he asked Border if he was okay, and Border responded that he was, in a clear and intelligible manner.  (Dkt. # 52 at ¶ 13).  Officer Achladis further recalls that Border did not have difficulty making his bed at that time and, at most, appeared to be slightly intoxicated.  (Dkt. # 52 at ¶ 12).

Inmate Gary Smith, who was in the same pod with Border, recalls that Border was slumped over as he entered the pod and his eyes were "red/glazed."  (Dkt. # 76-4 at ¶¶ 1, 3).  Inmate Lewis Moler describes Border's breathing as labored, and observed that Border's condition got worse as the evening went on.  (Dkt. # 76-5 at 2-3).  Smith recalls that at approximately 9:10 p.m., Border lost control of his bladder.  (Dkt. # 76-4 at ¶ 5).  Smith states that when this was brought to the attention of a corrections officer by another inmate, the unidentified officer responded by saying, "fuck him."  (Dkt. # 76-4 at ¶ 7).

Lewis Moler also states, without identifying the individuals by name, that at some point during the evening the "nurse" told a "C.O." that Border "was messed up."  (Dkt. # 76-5 at 1).  According to Moler, the corrections officer responded by saying Border "came in drunk" and that he would "sleep it off."  (Dkt. # 76-5 at 1).  Finally, Lewis Moler recalls that he witnessed inmate Gary Smith tell an unidentified corrections officer, over an intercom, that Border couldn't breathe.  Moler states, "[t]he C.O. told Gary they can't do anything until 6:00 A.M."  (Dkt. # 76-5 at 2).

**C. Death**

Border was found dead in his pod around 5:30 a.m. on the morning of January 13, 2008.  As soon as jail staff learned Border had stopped breathing, they immediately

responded and attempted to resuscitate Border.  (Dkt. # 46 at ¶ 18).  The coroner later concluded that Border died of acute polydrug intoxication by consuming excessive amounts of drugs including oxycodone, methadone, citalopram, and benzodiazepines. (Dkt. # 76-16).

## III. STANDARD OF REVIEW

Summary judgment is proper where there exists no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). "The plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

The party seeking summary judgment bears the initial burden of demonstrating that no genuine issue of material fact exists.  Id. at 323.  Once that burden has been met, the non-moving party may not rest upon the allegations set forth in his Complaint. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986).  Rather, he must present some significant probative evidence in support of his allegations.  Id.  "The disputed issue does not have to be resolved conclusively in favor of the non-moving party, but that party is required to present some significant probative evidence which makes it necessary to resolve the parties' differing versions of the dispute at trial."  60 Ivy Street Corp. v. Alexander, 822 F.2d 1432, 1435 (6th Cir. 1987) (citing First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 288-89 (1968)).  "The respondent cannot rely on the

hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989) (quoting Anderson, 477 U.S. at 250).  Although at the summary judgment stage this Court must view all facts in the light most favorable to the non-moving party, that party, "by affidavits or as otherwise provided by [FED. R. CIV. P. 56], must set forth specific facts showing that there is a genuine issue for trial."  FED. R. CIV. P. 56(e).

## IV. LAW AND ANALYSIS

The affirmative defense of qualified immunity "shields government officials from 'liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Smoak v. Hall, 460 F.3d 768, 777 (6th Cir. 2005) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  Qualified immunity is available to state officials sued in their individual capacities under 42 U.S.C. § 1983 for wrongful conduct committed during the performance of discretionary functions.  Garretson v. City of Madison Heights, 407 F.3d 789, 796 (6th Cir. 2005).  Because qualified immunity is immunity from suit, rather than simply a defense to liability, questions of qualified immunity are decided at the earliest possible stage of litigation.  Mitchell v. Forsyth, 472 U.S. 511, 526 (1985); Harlow, 457 U.S. at 818.

The Supreme Court has developed a two-part test for courts to determine whether a defendant is entitled to qualified immunity.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Dorsey v. Barber, 517 F.3d 389, 394 (6th Cir. 2008).  First, a court must decide whether,

taken in the light most favorable to the plaintiff, the facts alleged show that the defendant violated a constitutional right.  Saucier, 533 U.S. at 201.  If a violation is shown, the court must then determine whether the particular right was clearly established, such that a "reasonable public official would have been aware that his conduct violates the right in question."  Buchanan v. City of Bolivar, 99 F.3d 1352, 1358 (6th Cir. 1996) (citations omitted).[1]

The first step in the Saucier inquiry is to determine whether a constitutional violation occurred.  Plaintiffs contend that the Arresting Officers failed to provide proper medical care to Border during his arrest and transport to the Trumbull County Jail.

Specifically, Plaintiffs allege:

Defendant Officers Shawn Rentz, Officer Orslene, and Deputy Sabulsky acted with deliberate indifference and in a reckless manner to a substantial risk by not notifying the Trumbull County Jail and its Medical Personnel that Border was arrested with an empty prescription pill bottle in his possession, and that they were told by witnesses at the scene, including the assault victim, that Border had consumed an entire bottle of prescription pills, was visibly intoxicated, and had a history of drug abuse.

(Dkt. # 15 at ¶ 56).

In addition, Plaintiffs contend that the County Defendants failed to provide proper medical care to Border during his booking and detention at the Trumbull County Jail.

Specifically, Plaintiffs allege:

---

1 In 2009, the Supreme Court held that the two step procedure of Saucier, which required the constitutional violation prong to be decided before determining whether the right is clearly established is no longer mandatory.  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).  Instead, district courts have the discretion to determine which question should be answered first.  The Sixth Circuit has followed this rule. Compare Grawey v. Drury, 567 F.3d 302, 309 (6th Cir. 2009) (applying "the traditional analysis" of Saucier) with Waeschle v. Dragovic, 576 F.3d 539, 544 (6th Cir. 2009) (exercising its discretion to apply the clearly established prong first).  However, in the instant matter this Court sees no reason to vary from the traditional approach outlined in Saucier.

> The Sheriff, County, Assistant Wardens, Corrections Officers, Medical Personnel, and Nurses, through their customs, policies, patterns and practices have each acted negligently, intentionally, recklessly, and with deliberate indifference to a substantial known risk to Adam Border's Constitutional rights in their failures to adequately train, supervise, implement, perform, and enforce policies to protect inmates that are suspected of drug overdosing.
>
> Defendants Sheriff, County, Assistant Wardens, Medical Personnel, and Nurse Whitlock and Adrienne, and the Corrections Officers acted with deliberate indifference to a substantial risk by not providing Border with adequate basic medical care while in their custody.

(Dkt. # 15 at ¶¶ 51, 54).

The Sixth Circuit has held that the Eighth Amendment's prohibition of cruel and unusual punishment does not apply to pretrial detainees. Watkins v. City of Battle Creek, 273 F.3d 682, 685 (6th Cir.2001). Rather, in section 1983 claims, the Fourteenth Amendment affords pretrial detainees analogous rights, including the right to "adequate medical treatment." Id. at 685-686; see also Estate of Carter, 408 F.3d 305, 311 (2005).

A showing of mere negligence is insufficient to demonstrate that a defendant has violated the constitution. Farmer v. Brennan, 511 U.S. 825, 835 (1994). To succeed on such a claim, a plaintiff must demonstrate that the defendant acted with "deliberate indifference to the serious medical needs" of the pretrial detainee. Watkins, 273 F.3d at 686 (quoting Estelle v. Gamble, 429 U.S. 97 (1976). "[D]eliberate indifference requires that the defendant knew of and disregarded a substantial risk of serious harm to [the plaintiff's] health and safety." Id. at 686.

Deliberate indifference may be shown by proving both an objective component, (1) "the existence of a 'sufficiently serious' medical need" on behalf of the plaintiff; and

10

a subjective component, (2) "a sufficiently culpable state of mind in denying medical care" on the part of a defendant.  Blackmore v. Kalamazoo, 390 F.3d 890, 895 (6th Cir. 2004) (quoting Farmer, 511 U.S. at 834).

To prove the objective component of a claim for medical care, Plaintiffs must show that Border had a medical need that was both "apparent and serious," to the defendants in this case.  Blackmore, 390 F.3d 890, 895.  To prove the subjective component, it is insufficient for Plaintiffs to demonstrate that a substantial risk of serious harm to Border existed.  Rather, to defeat qualified immunity, the defendants in this case must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed and they must also have drawn that inference. Id.  (quoting Farmer, 511 U.S. at 834).  "If an officer failed to act in the face of an obvious risk of which he should have known but did not, the officer has not violated the. . . Fourteenth Amendment[]."  Estate of Carter, 408 F.3d at 312 (citations omitted).

## A. Arresting Officers

In essence, Plaintiffs contend that the Arresting Officers had sufficient information to make them aware that Border had overdosed on prescription medication and should have communicated this information to staff present at the Trumbull County Jail.  To support this contention, Plaintiffs rely upon affidavits of eye-witnesses at the scene when Border was arrested.

For example, Lacina Smith states the following in her affidavit:

She witnessed Adam exit the vehicle and she saw a pill bottle in his hand. Adam was putting the lid on the bottle as he was exiting the car. She

11

> notice (sic) that the pill bottle was completely full as Adam was putting the
> lid on.

(Dkt. # 76-1 at ¶ 5).

> She completed a written statement and also advised that officers,
> Officer Shawn Rentz from the Bazetta Township Police department, and
> another officer from the Cortland Police Department, that Adam was
> "messed up" and had a pill bottle on him that was full pills (sic).

(Dkt. # 76-1 at ¶ 18).

The record contains clear evidence that Border was intoxicated at the time of his arrest and transport, and that the Arresting Officers were aware of this fact.  However, this awareness alone is not sufficient to show that the Arresting Officers violated Border's Fourteenth Amendment rights.  See Smith v. Pike County, 2009 Fed. App. 0481N at *3 (6th Cir. 2009); Estate of Abdel-Hak v. City of Dearborn, 1989 U.S. App. LEXIS 4609 at *5-7 (6th Cir. 1989).

In Smith v. Pike County, the Sixth Circuit held that county and jail officials were entitled to qualified immunity when a detainee denied ingesting a dangerous quantity of drugs.  Id.  Although the detainee was clearly intoxicated, officials had no indication that she was experiencing an overdose, and she did not exhibit any symptoms of overdose or demonstrate immediate need for medical attention.  Id.  Similarly, in Estate of Abdel-Hak, the Sixth Circuit held that officers could not be deliberately indifferent to the detainee's serious medical needs when the officers believed the detainee's behavior demonstrated intoxication from alcohol, and not a lethal cocaine overdose.  Estate of Abdel-Hak, 1989 U.S. App. LEXIS 4609 at *6-7.

In Watkins v. City of Battle Creek, a pretrial detainee died in jail custody after he denied he had ingested cocaine and then refused medical treatment. Watkins, 273 F.3d at 685. The Sixth Circuit held that the Arresting Officers and jail personnel were not deliberately indifferent to the detainee's Fourteenth Amendment rights because it was not enough for plaintiff to demonstrate a question of fact as to whether the officers should have known that Watkins had swallowed drugs. Id. at 686. The Sixth Circuit stated that such evidence was not sufficient to lead a rational trier of fact to conclude that the officers or jailers knew Watkins needed medical attention. Id.

Here, there is insufficient evidence in the record to support Plaintiffs' contention that the Arresting Officers were aware of anything more serious than Border's intoxication. Plaintiffs have only offered a set of facts that the Arresting Officers must have pieced together in order to constitute deliberate indifference. Yet Plaintiffs have presented no evidence whatsoever that the Arresting Officers actually made the connection between Border's possible possession of a bottle of pills—which was not found until after Border's death—and the fact that Border had ingested an unsafe amount of those pills. To the contrary, the record indicates that Border concealed this fact from the Arresting Officers.

While this Court must accept as true that Lacina Smith informed the Arresting Officers that Border possessed a bottle of pills, no one explicitly reported the possibility of an overdose to the officers. Even if Smith herself was aware that Border had overdosed, there is insufficient evidence in the record that she communicated this fact to the Arresting Officers. Moreover, the "dash-cam" and the written accounts of the

13

witnesses depict what appears to be a routine arrest and transport of an intoxicated individual.

Plaintiffs have, therefore, not shown that the Arresting Officers were deliberately indifferent to Border's medical needs and, consequently, Plaintiffs have not shown a violation of any of Border's constitutional rights.  Moreover, assuming *arguendo* these defendants did violate Border's constitutional rights, Plaintiffs have failed to satisfy the second prong of <u>Saucier</u>.  Even when the facts are viewed in the light most favorable to the Plaintiffs, a reasonable public official would not have been aware that the conduct exhibited by the Arresting Officers violated Border's rights.  Accordingly, the Arresting Officers are entitled to qualified immunity.

### B. County Defendants.

#### 1. Motion to Strike

Plaintiffs next contend that the County Defendants acted with deliberate indifference when they failed to provide Border medical treatment while he was detained at the Trumbull County Jail.  As a threshold matter, the County Defendants have filed a motion to strike the affidavits of inmates Gary Smith, Lewis Moler, Robert Key, and Ted Murray, who were present at the Trumbull County Jail on the night of Border's death. The County Defendants assert that these affidavits are "replete with inadmissible hearsay, opinions, and speculation," and have moved this Court to strike the affidavits in whole or in part.

"Under Fed.R.Civ.P. 56(e), affidavits submitted in opposition to a summary judgment motion 'shall be made on personal knowledge, shall set forth such facts as

14

would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.'" <u>Monks v. General Elec. Co.</u>, 919 F.2d 1189, 1192 (6th Cir. 1990).  "Affidavits composed of hearsay and opinion evidence do not satisfy Rule 56(e) and must be disregarded." <u>State Mutual Life Assurance Co. v. Deer Creek Park</u>, 612 F.2d 259, 264 (6th Cir. 1979).  This Court, therefore, will not consider any portions of the affidavits that it deems inadmissible hearsay.

The most relevant portions of the affidavits that the County Defendants find objectionable include statements from the following witnesses:

Gary Smith:

> That Cameron told the C.O. he (Adam) needs help; that he (Adam) wet himself and the C.O. said, "fuck him."

(Smith Affidavit at ¶ 7).

> Cameron told me that he told C.O. Showers that Adam swallowed a whole bottle of pills, oxy, and C.O. Showers said, "fuck him."

(Smith Affidavit at ¶ 8).

> That C.O. Naples also heard how Adam was breathing and he said that the nurse  was gone so "you all watch him;"

(Smith Affidavit at ¶ 11).

> That about every 30 minutes a C.O. is being told by me and others, that Adam needs help and the C.O. would say, "we are not the nurse, you watch him;"

(Smith Affidavit at ¶ 13).

> That at 4:00 a.m. (C.O. Naples) was handing out razors and again I told C.O. Naples that Adam needs help;"

(Smith Affidavit at ¶ 14).

Lewis Moler:

The nurse told the C.O. that Adam was messed up, send him to medical. The C.O. said he came in drunk & he will sleep it off."[2]

(Dkt. #76-5 at 1).

Gary Smith started complaining to the C.O. about Adam being sick. He was having trouble breathing & to do something about it. Through the intercom the C.O. tells Gary Smith don't worry about it."

(Dkt. #76-5 at 2).

Gary Smith is hitting the intercom button & telling the C.O.'s Adam can't breathe. The C.O. told Gary they can't do anything until 6:00 a.m."

(Dkt. #76-5 at 2).

Gary again complained to the C.O. passing out razors that Adam can't breathe. C.O. responds, nurse will be here at 6:00 a.m. & if I move him now, I will move him to the ladies block."

(Dkt. #76-5 at 3).

"A statement that is not offered to prove the truth of the matter asserted but to show its effect on the listener is not hearsay." Biegas v. Quickway Carriers, Inc., 573 F.3d 365, 379 (6th Cir. 2009). Many of the statements referenced above cannot be considered hearsay because they are not offered to prove the truth of the matter asserted. Those statements offered to show that officers were warned of Border's medical condition are not offered to prove Border's medical condition, but rather, to prove that the officers received warnings and notice of a potentially serious situation. In addition,

---

2 The Affidavit of Robert Key also contains a reference to hearing the corrections Officer Showers say "he will sleep it off." (Dkt. #76-6 at 2).

statements offered to show the state of mind of the officers shall be considered by this Court.

On the other hand, the affidavit of Gary Smith contains several statements that constitute "double hearsay," and have thus been disregarded.  For example, Paragraph Eight of Smith's affidavit states: "Cameron told me that he told C.O. Showers that Adam swallowed a whole bottle of pills, oxy, and C.O. Showers said, 'fuck him.'"

This is a critical statement and allegation, as it is the only evidence in the record that would prove any of the defendants in this case actually had knowledge that Border took prescription pills.  However, this Court finds that such a statement is inadmissible double hearsay because it is a statement another inmate, Cameron Tillis, made to Smith about a conversation that Officer Showers allegedly had with Tillis.  Therefore, Plaintiffs must demonstrate that both layers of hearsay would be admissible at trial.  See FED. R. EVID. 805 ("Hearsay included within hearsay is not excluded under the hearsay rule if each part of the combined statements conforms with an exception to the hearsay rule…").  See also Smith v. City of Allentown, 2009 U.S. App. LEXIS 28188 at *23 (3rd Cir. 2009) (applying FED. R. EVID. 805).  While Plaintiffs might contend that this conversation is offered to show notice and state of mind, Plaintiffs have not demonstrated that the second layer of hearsay would be admissible at trial.  The conversation is offered for the truth of the matter asserted (i.e., that Cameron told Officer Showers that Border had taken prescription pills, and officer showers responded by saying, "fuck him").  Therefore, these inherently unreliable statements will not be considered by this Court.

### 2. Officers Naples and Geer

Inmate Lewis Moler states in his affidavit that Inmate Gary Smith reported multiple times, through the intercom, that Border was having trouble breathing and required assistance.  Moler recalls that the corrections officer to whom Smith spoke—who is unnamed in the affidavit—told Smith not to worry about it.  (Dkt. # 76 -5 at 2).  In another instance, according to Moler, a corrections officer responded to Smith's warnings by stating that the officers could not do anything until 6:00 a.m.  (Dkt. # 76-5 at 2).

Officer John Naples acknowledges that at 12:05 a.m. he received notice from Gary Smith, through the intercom, that Border was having trouble breathing.  (Dkt. # 46 at ¶ 10).  Naples asserts that he relayed this request to Officer Mike Geer, who "immediately caused medical treatment to be rendered to Border."  (Dkt. # 46 at ¶ 11).  However, while Geer confirms in his affidavit that Naples asked him to escort an inmate to the jail's medical area at 12:05 a.m., the inmate was not Border.  (Dkt. # 50 at ¶ 15).  Geer states that while escorting this other inmate, he observed Border sleeping on his bunk and snoring, and maintains that at that time, Border did not appear to be experiencing medical problems.  (Dkt. # 50 at ¶¶ 16, 17).

This Court finds that the conflicting versions of these events create a disputed issue of material fact as to whether Naples and Geer were deliberately indifferent in denying Border medical care.  The parties do not dispute that Naples received requests for medical assistance, over the intercom, reporting that Border was having trouble breathing.  However, the parties do disagree as to how the officers responded to the requests.  According to the Plaintiffs' version, these officers were made aware, but

ignored or dismissed the inmates' warnings that Border had an apparent and serious medical need.  Such conduct would be a violation of a clearly established constitutional right of which a reasonable person would have known.  Therefore, Officers John Naples and Mike Geer are not entitled to qualified immunity at this juncture.

### 3.  Michael Palumbo

Finally, the actions of Officer Michael Palumbo are distinct from actions of the other defendants in this case.  Plaintiffs have put forth unchallenged evidence that Officer Palumbo altered jail records fifteen months after he booked Border into the Trumbull County Jail.  (Dkt. #76-3).  According to a letter from counsel for Trumbull County, Officer Palumbo failed to note on a "Medical Observation form" that Border appeared to be under the influence of "barbiturates, heroin or other drugs," but later altered the records to indicate that Border did appear to be under the influence of these substances. (Dkt. #76-3).

While it is by no means conclusive that Officer Palumbo committed any wrong doing, these facts must be viewed in the light most favorable to Plaintiffs, and call into question whether Officer Palumbo was aware that Border had taken prescription medication, and whether he had knowledge that he should have communicated to the nurse, or otherwise sought medical care for Border.  If so, Officer Palumbo was deliberately indifferent to Border's medical care, thus violating Border's Fourteenth Amendment Rights.  Furthermore, a reasonable public official would have been aware that withholding such information violated Border's constitutional rights.  Officer Palumbo is, therefore, not entitled to qualified immunity as a matter of law.

### 4. Officers Achladis, Showers, Harvey, and Mekker

The record, viewed in the light most favorable to the Plaintiffs, indicates that Officers Nicholas Achladis, William Showers, Todd Harvey, and William Mekker ("remaining County Defendants") may have had knowledge that Border showed signs of intoxication.  However, as discussed above, awareness of intoxication is not enough to prove these defendants had a culpable state of mind.  The defendants must have drawn an inference that Border was in fact experiencing a serious medical condition beyond intoxication.

Plaintiffs have failed to put forward any admissible evidence of a culpable state of mind on the parts of the remaining County Defendants.  Instead, Plaintiffs have presented only inadmissible hearsay statements, statements that only show the officers were aware that Border was intoxicated, or statements that only refer to unidentified corrections officers.  Such statements, therefore, do not sufficiently link the remaining County Defendants to any wrong doing.

The remaining County Defendants insist that they were not aware that Border had taken any medication, let alone overdosed.  Moreover, the affidavits provided by the defendants paint a picture of what on the surface appeared to be an intoxicated individual—a common sight in a county jail.  The record clearly shows that jail staff checked on Border frequently and did provide Border medical attention for the minor gash he received on his forehead.  In addition, Border's repeated denials that he took prescription pills reinforce this Court's finding that none of the remaining County Defendants had a culpable state of mind.  While the record does indicate that some

20

inmates may have been aware that Border took prescription pills, there is no evidence— other than inadmissible hearsay statements—that this information was communicated to any of the remaining County Defendants.

Because Plaintiffs have not shown that any of the remaining County Defendants acted with deliberate indifference in denying Border medical treatment while he was detained at the Trumbull County Jail, Plaintiffs cannot show that the these four defendants violated Border's constitutional rights.  In addition, with respect to these defendants, Plaintiffs have failed to satisfy the second prong of Saucier.  Even when the facts are viewed in the light most favorable to the Plaintiffs, a reasonable public official would not have been aware that the conduct described above violated Border's rights. Because Border concealed his condition, was treated by Naureen Whitlock, and was continually monitored by jail staff to be sure he was breathing properly, it is apparent that all of the remaining County Defendants acted in a manner that a reasonable officer would act, given the circumstances.  Accordingly, the remaining County Defendants are entitled to qualified immunity.

## V. CONLUSION

For the reasons stated above, Defendant's July 16, 2009 Motion for Summary Judgment is **GRANTED** (Dkt. # 41),  Defendants' July 17, 2009 Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART** (Dkt. # 55), and Defendants' July 22, 2009 Motion for Summary Judgment is **GRANTED** (Dkt. # 59). Accordingly, Defendants William Meeker, Todd Harvey, William Showers, Nicholas Achladis, Shawn Rentz, John Weston, and Steve Orslene are hereby **DISMISSED**.

In addition, Defendants' Motion to Strike is **GRANTED IN PART AND DENIED IN PART** (Dkt. # 83), and Plaintiffs' Motion for Leave to File Clarifying Affidavits is **GRANTED** (Dkt. # 87).

This Court will hold a second case management conference on January 29, 2010, at 10:00 am.

**IT IS SO ORDERED.**

**/s/ Peter C. Economus – January 14, 2010**
**PETER C. ECONOMUS**
**UNITED STATES DISTRICT JUDGE**